**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

FRANKLIN B. WENDT,       )
                                )
    Plaintiff,        )
                                )    Case No. 14 C 0910
v.                          )
                                )    Magistrate Judge Jeffery Cole
CAROLYN W. COLVIN, Acting     )
Commissioner of Social Security    )
Administration             )
                                )
    Defendant.       )

## MEMORANDUM OPINION AND ORDER

The plaintiff, Franklin B. Wendt, seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"). 42 U.S.C. § 423(d)(2). Mr. Wendt asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

### I. The Procedural History

Mr. Wendt applied for DIB on June 24, 2011, alleging he was disabled since January 30, 2006, due to status post back surgeries, herniated discs, scoliosis, lumbago, Crohn's disease, and cardiomyopathy. (Administrative Record ("R.") 20, 175, 224). His application was denied initially on October 13, 2011, and upon reconsideration on February 15, 2012. (R. 124-128, 133-136). Mr. Wendt filed a timely request for hearing in pursuit of his claim on March 7, 2012. (R. 137-138). The administrative law judge ("ALJ") convened a hearing on September 18, 2012, at which Mr. Wendt, represented by counsel, appeared and testified. (R. 46-111). Additionally,

1

Dr. James McKenna and vocational expert, Pamela Tucker, testified at the hearing. (R. 78-100, 100-110). On November 9, 2012, the ALJ denied Mr. Wendt's application for DIB, finding that there were jobs existing in significant numbers that he could perform despite his limitations. (R. 15-30). Mr. Wendt filed a timely request for review of the ALJ's decision with the Appeals Council, and on December 17, 2013 the ALJ's decision became the Commissioner's final decision when the Appeals Council denied Mr. Wendt's request. (R. 1-2). On February 10, 2014, Mr. Wendt appealed that decision to the federal district court under 42 U.S.C. § 405(g), and both parties consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c).

## II. The Record Evidence

### A. The Vocational Evidence

Mr. Wendt was born on October 2, 1967, making him forty-five years old at the time of the ALJ's decision. (R. 220). He is married and lives with his nephew. (R. 255). He is 6' tall and weighs 218 lbs. (R. 701). Mr. Wendt has a high school education. (R. 225). From July 1991 until January 2006, Mr. Wendt worked as a truck driver for a building products company. (R. 242-243). He was let go from his job after a work accident and has not worked since January 2006.

### B. The Medical Evidence

Mr. Wendt first visited St. James Occupation and Environmental Health Centers on January 30, 2006 after suffering an injury while lifting a 300 lbs bay window at his job. (R. 369, 400). His primary complaint was pain in the left side of his lower back and an inability to bend or stand. (R. 400). A CT scan of the lumber spine taken at the time showed no evidence of fracture or dislocation. (R. 369). The treating physician, Dr. Herbert White, prescribed Mr.

Wendt Anaprox DS twice a day and took Mr. Wendt off work status. (R. 400). At a follow up appointment, Dr. White noted Mr. Wendt's inability to bend at the waist and to tie his shoes and a positive straight leg raise test on the left leg. (R. 402). He changed his work status to light work with restrictions on lifting over 5 lbs and bending, twisting, and stooping. (R. 402). Mr. Wendt attended physical therapy sessions during the month of February 2006, and on February 22, 2006, Dr. White ordered an MRI that indicated that Mr. Wendt had a disc herniation at the L5-S1 level. (R. 395-410, 397).

In May 2006, Mr. Wendt began visiting Dr. Richard Freeman. Dr. Freeman's initial case notes indicate that Mr. Wendt complained of numbness in his legs and back pain that radiates into his hips. (R. 443). The initial case notes also indicate Mr. Wendt's history of Crohn's disease and show him taking Coreg, Colazal, and Librax to treat the disease. (R. 443). Dr. Freeman ordered a new MRI of the lumber spine, and after noting that Mr. Wendt's disc herniation appeared "somewhat worse" than his February 2006 MRI, Dr. Freeman recommended a L5/S1 discectomy. (R. 441). The surgery was conducted June 13, 2006. (R. 474).

Mr. Wendt was able to leave the surgical outpatient center without any discomfort; however, he continued to report back pain after the June 2006 discectomy. (R. 439). At an August 14, 2006 appointment with Dr. Freeman, Mr. Wendt reported his pain at 6-7 out of 10. (R. 435). At this time, Dr. Freeman noticed an extreme scoliotic curve when Mr. Wendt sat, favoring his left buttocks over his right. (R. 435). Dr. Freeman ordered a new MRI, which showed scar tissue where the disc herniation previously was and no significant impingement of the nerve roots. (R. 432). Over the coming months, Dr. Freeman prescribed physical therapy for Mr. Wendt. which was successful in strengthening Mr. Wendt's back muscles. (R. 427). Dr.

Freeman also prescribed new pain medications like Vicodin and Flexeril and eventually an epidural steroid injection. (R. 423-430). He also ordered an EMG/NCV study which was completely within normal limits; however Mr. Wendt continued to complain of lower back and hip pain, and he continued to exhibit a positive straight leg raise test on his right leg. (R. 418). Dr. Freeman hypothesized that Mr. Wendt may require fusion surgery to stabilize his back, but Dr. Freeman was retiring on June 10, 2007 and referred Mr. Wendt to another physician in his medical group, Dr. Patrick John Sweeney. (R. 418).

Dr. Sweeney noted Mr. Wendt's symptoms -- back pain, trouble sitting, hip pain -- in his first appointment with Mr. Wendt and ordered a discogram. (R. 561). The discogram showed extravasation of contrast material at the L5-S1 level through the posterior annulus into the central canal consistent with an annular tear. (R. 591). Dr. Sweeney recommended spinal fusion surgery based off the results of the discogram. (R. 557). Mr. Wendt's workers compensation insurance provider initially rejected this surgery, but after Mr. Wendt obtained a supportive second opinion from Dr. Edward Goldberg, the insurance provider approved the surgery. (R. 547-549). The surgery was scheduled for September 22, 2008. (R. 647).

Initially, post fusion surgery, Mr. Wendt reported a decrease in his pain, but the pain grew worse as time progressed. (R. 544). On December 3, 2008, Mr. Wendt began a program of physical therapy to improve his range of motion in the lumber spin, improve right hip mobility, and strengthen his right lower extremity. (R. 614-616). However, by March 25, 2009, Mr. Wendt had to suspend the physical therapy because his pain was interfering with the exercises. (R. 609). During this time, Dr. Sweeney noted that it appeared from x-rays that Mr. Wendt's fusion was progressing nicely. (R. 534-536). Dr. Sweeney, however, also disputed a CT scan

that showed less good bone at the fusion site in April 2009. (R. 527). Around the beginning of summer 2009, Dr. Sweeney explored the hypothesis that the hardware from Mr. Wendt's fusion surgery was causing his pain. (R. 523). Mr. Wendt stated at this time that his lower back and buttock pain were 6 out of 10 during the day and as high as 10 out of 10 at night. (R. 525). In August 2009, Dr. Sweeney had Mr. Wendt injected with an epidural steroid at his hardware site, which provided Mr. Wendt about three to five days of relief from his pain. (R. 518). This lead Dr. Sweeney to conclude that the hardware was causing Mr. Wendt's pain. (R. 518). Surgery to remove the hardware, explore the fusion site, and possibly refuse the vertebrae was scheduled for November 9, 2009. (R. 629). At the time of the surgery, Mr. Wendt was taking as prescription medication Pravastatin, Norco, Flexeril, fish oil, and Carvedilol (a heart medication) and was wearing a TheraBack brace. (R. 510).

Mr. Wendt's hardware removal surgery showed mixed results. During the surgery, Dr. Sweeney noted that fusion bone was not abundant, but he could not see any gross movement at the fusion site. (R. 624). After removing the hardware, he elected to do an insitu-fusion with two Infuse soaked sponges combined with a MasterGraft to bridge the area. (R. 624). However, after about an hour in recovery, Mr. Wendt began to complain that he could not move his right leg and felt numbness and weakness in the right leg. (R. 324). He was taken to St. James Hospital to be monitored. (R. 324).

At the hospital, Mr. Wendt underwent an MRI of his lumbar spine that showed mild bilateral facet arthropathy in the L3-L4 region, mild disc bulge in the L4-L5 region, and no neural foraminal narrowing or central canal stenosis in the L5-S1 region -- results similar to his previous MRIs. (R. 307-308). His doctor also ordered a EMG test, performed by Dr. Bridgette

Arnett, of Mr. Wendt's right leg. Dr. Arnett's test revealed "borderline delay in bilateral H-reflexes but normal deep tendon reflexes suggesting a mild neuropathy that is not born out in the rest of the study." (R. 321). She also noted "for recruitment patterns no effort was offered from the patient" and that "no radiculopathy or neuropathy was observed despite the lack of muscle effort on patient's part." (R. 321).

Immediately after the surgery, Mr. Wendt continued to experience problems with back pain, right leg pain, and an inability to walk. (R. 502-509). Mr. Wendt said on December 10, 2009 that his right leg pain was at a 4 out of 10 when he walks. (R. 508). On January 7, 2010, Mr. Wendt was given a trigger point injection of 80 mg of Depo Medrol which he initially reported gave him good pain relief, but the relief waned by his next appointment on February 4, 2010. (R. 504-506). Mr. Wendt also began another course of physical therapy at this time. His initial physical therapy evaluation reported decreased lumbar and right leg strength, and a subsequent progress report noted moderate to max muscle atrophy. (R599-601). On March 4, 2010, Mr. Wendt began seeing another physician Dr. Douglas Johnson. (R. 502).

Dr. Johnson had a different interpretation of the cause of Mr. Wendt's pain. On his initial visit, Dr. Johnson reviewed Mr. Wendt's November 9, 2009 MRI and noted a type 2 to 3 modic change in the L5-S1 cage, right L5-S1 foraminal stenosis, and a swollen S1 nerve root. (R. 672-673). He also noted that the November 9, 2009 operation report showed that the fusion bone was "not abundant" and hypothesized that either there was ectopic bone compressing the right S1 nerve root or the Infuse itself was inflaming the nerve root, which is a possible reaction to Infuse. (R. 673). At the time of his initial visit to Dr. Johnson, Mr. Wendt was taking

Cyclobenzaprine HCL (chemical name for Flexeril), Pravastatin Sodium, and Carvedilol as prescription medications. (R. 672).

An April 13, 2010 MRI reported "no significant bony central stenosis or foraminal narrowing" at L5-S1. (R. 676). However, upon examining the MRI images, Dr. Johnson disagreed with the radiologist's findings, noting "there are space-occupying masses: one at the L4/L5 level and a larger mass at the L5/S1, right level causing nerve and sac-cutoff signs. These masses appear to be similar in density to bone." (R. 669). Dr. Johnson recommended another surgery to remove the masses compressing the nerve roots and re-fuse the L5-S1 space. (R. 664-669). At his last appointment with Dr. Johnson, Mr. Wendt reported back pain at 6 out of 10 during the day and 10 out of 10 at night and first thing in the morning. (R. 663). Mr. Wendt's workers compensation insurance expired sometime after this last appointment. (R. 64).

After his insurance coverage expired, Mr. Wendt received less medical treatment. On June 18, 2011, Mr. Wendt had a Functional Capacity Evaluation (FCE) with Mr. Peter McMenamin, PT, MS, OCS. (R. 685-688). The report noted that Mr. Wendt fully participated in all tasks without self-limiting behavior and overextended himself on 3 of 21 tasks. (R. 686). Mr. Wendt was found to be unable to lift any weight from the floor to waist, and "never", where "never" means unable to do a task for up to 1/3 of an 8-hour work day, stand, climb a ladder, or work bent over-sitting. (R. 686-687). Overall, the report found Mr. Wendt unable to meet the demands of sedentary work. (R. 688).

In his Function Report, which he filled out as part of his DIB application, Mr. Wendt listed difficulties similar to the FCE. (R. 254-262). He described his typical day as spent mostly lying down or napping and wrote that his pain prevents him from doing things like chores, social

activities, dressing, and sleeping. (R. 259). In the report, he claimed to be able to walk only about 20 ft before having to rest, but also that the extent of his inability to walk depended on how much pain he had that day. (R. 259). At this time, Mr. Wendt was only taking Aleave for his pain and claimed that he could not afford the other pain medications he used to take. (R. 261). His hobbies and interests were also limited because of his back and leg pain. (R. 258).

Mr. Wendt was given a Consultative Examination by Dr. Charles Carlton, MD for the Bureau of Disability Determination Services (BDDS) on September 17, 2011. (R. 700-707). Overall, Dr. Carlton concluded that Mr. Wendt could safely sit, walk greater than 50 ft without an assistive device, handle objects with both hands, and lift up to 20 lbs. However, his report noted that Mr. Wendt avoided bearing weight on his right foot when walking, and evaluated Mr. Wendt as having "Moderate" difficulty walking on toes and "Mild" difficulty walking on heels. (R. 701, 704). Mr. Wendt also scored a 20/60 for true flexion of the lumber spine, a 30/90 for flexion of the lumbar spine including hip flexion, a 10/25 for lumbar spine extension, a 15/25 for left lateral lumbar spine bending, and a 15/25 for right lateral lumbar spine bending. (R. 705).

Using the Consultative Examination and Mr. Wendt's medical records, Dr. Charles Kenney, MD completed a Physical Residual Functional Capacity Assessment for Mr. Wendt on October 7, 2011. (R. 708-715). In Dr. Kenney's assessment, Mr. Wendt was able to lift 20 lbs occasionally, lift 10 lbs frequently, stand for at least 2 hours in an 8-hour workday, sit for 6 hours in an 8-hour workday, push/pull an unlimited amount in an 8-hour workday, and occasionally use ladders, ropes, and scaffolds. (R. 709-710). Dr. Kenney found Mr. Wendt's statements about his pain and limitations only "partially credible" because he stated on his ADL report that he could walk 20 feet before needing to rest, while Dr. Carlton's exam showed he

could walk 50 ft unassisted.  (R. 713).  Dr. Kenney also found Mr. McMenamin's assessment worthy of only "little weight" because Mr. McMenamin was "a PT, not a DO or MD" and "not an acceptable medical source per SSA standards."  (R. 714).  Dr. Carlton's statements, however, deserved "great weight" because the opinions were "based in sound clinical techniques" and "there is no treatment relationship [between Mr. Wendt and Dr. Carlton]."  (R. 714).

### C.  The Administrative Hearing

#### 1.  Mr. Wendt's Testimony

Mr. Wendt's testimony about his typical day mirrored much of what he wrote in his Function Report.  He stated that he usually gets up around 9:00am-10:00am in the morning.  (R. 56).  His wife needs to help him get into the shower and then help him dress his lower body.  (R. 56-57).  Mr. Wendt testified that after getting dressed he usually eats breakfast and then lays on the couch or bed until lunchtime.  (R. 57-58).  His wife leaves for her part time job around lunchtime, and Mr. Wendt will then lay in bed until his nephew comes home from school around 3:30 pm.  (R. 57-59).  At that time, he helps his nephew start his homework and then goes back to lay in bed.  (R. 58).

Mr. Wendt testified that he does not sleep through the night and is lucky if he gets 3 hours of sleep straight.  (R. 59).  Leg pain, lower back pain, hip pain, and spasms prevent Mr. Wendt from sleeping at night.  (R. 59).  It is hard for him to find a comfortable position to sleep in, and he can only stay in one position for so long before he has to move around and wakes up.  (R. 72).

Concerning his pain, Mr. Wendt testified that the pain is in his lower back, hips, right buttocks, and down to his leg all the way to his toe and heel.  (R. 61).  It is a sharp pain that is

constantly present. (R. 61). Movement makes his pain worse. (R. 66). Mr. Wendt testified that he believed he could stand 10-15 minutes without pain, sit 5-10 minutes without pain, and cannot bend. (R. 66). During the testimony, Mr. Wendt's attorney indicated that Mr. Wendt was constantly sitting and standing up in his chair. (R. 71). Mr. Wendt testified that he did this because of a sharp pain in his hip and leg and that his muscles were getting tight by sitting. (R. 71). Sitting upright hurts him, which is why he usually lays down flat during the day. (R. 71). Mr. Wendt testified that the pain gets worse during cool and damp days. (R. 73-74).

Mr. Wendt also testified about his discectomy in 2006 and hardware removal surgery in 2009. He said that his 2006 discectomy gave him some pain relief, but the physical therapy after the surgery made the pain a lot worse, and the pain has not gotten better since then. (R. 60). He also discussed his 2009 hardware removal surgery and his loss of feeling in his right leg. (R. 70). Mr Wendt reported that Dr. Johnson told him that it was possible that a surgeon nicked a nerve during the 2009 hardware removal surgery causing Mr. Wendt's leg pain and right foot drag. (R. 73).

Since losing his insurance, Mr. Wendt only took over-the-counter prescription medication for his pain. (R. 62). He testified that he stopped taking over-the-counter medications in August 2011 because the effect of the pills was diminishing. (R. 62). Mr. Wendt also talked about when he took Hydrocodone. (R. 63-64). He testified that he stopped taking Hydrocodone when he lost his insurance in early 2011. (R. 64).

Mr. Wendt also testified about his Crohn's Disease. He told the ALJ that he was diagnosed with Crohn's Disease sometime between 2003-2004 after an appendectomy. (R. 67). The disease caused abdominal pain and frequent bowel movements. (R. 67). Mr. Wendt

claimed he had to use the washroom around 8 times a day, and more frequently during the summer. (R. 67). Mr. Wendt said that the last time he saw a doctor for Crohn's Disease was in 2004, and the last time he took medication for it was in 2006, but that he stopped getting treatment for the disease because his health insurance expired. (R. 67-68).

Parts of Mr. Wendt's testimony also focused on his lack of insurance coverage and solicitation of free health care. He said that his health insurance through his job ran out in 2006 and that his workers compensation coverage ran out in 2011. (R. 68). In terms of free health care, Mr. Wendt claimed he did not look for free health care because he did not know where to look. (R. 68). He further elaborated that he would probably start looking for free health care at Cook County Hospital, but the hospital is in downtown Chicago and it would be too hard to travel to the hospital. (R. 72-73).

## 2. Dr. McKenna's Testimony

Much of Dr. McKenna's testimony focused on disputing whether the MRI reports could lead to Mr. Wendt's reported pain. For example, he questioned the results of Mr. Wendt's May, 17, 2006 MRI which reported "a small extension of the disc signal material into the ventral epidural sac centrally with compression of the ventral thecal sac and the S1 nerve root sleeves." (R. 79). Dr. McKenna claimed that a small extension of the disc material into the ventral epidural space would not cause significant compression of the dural sac, thecal, or S1 nerve roots. (R. 79-80). Dr. McKenna did note the presence of granulation/scar tissue from a September 7, 2006 MRI, which he hypothesized could develop into arachnoiditis, but discounts the MRI because it showed no recurrent disc herniation, positive asymmetry of the S1 nerve roots, and positive symmetrical signals of both nerves. (R. 81-82). When prompted by Mr.

Wendt's attorney whether it was reasonable to believe that Dr. Johnson thought there was an objective cause of Mr. Wendt's pain based on Dr. Johnson's recommendation of surgery, Dr. McKenna responded "well, I'm not quite sure whether Dr. Johnson is treating pain or whether he is treating an MRI result." (R. 96).

Dr. McKenna also testified that the EMG results supported a conclusion that there was no medically objective basis for Mr. Wendt's claim. He noted Mr. Wendt's normal EMG report from September 17, 2007. (R. 83). Additionally, Dr. McKenna discussed the consultation and EMG test Dr. Arnett performed on November 11, 2009. (R. 83-84). He testified that the consultation report indicated that Mr. Wendt did not perform the dorsiflexion or plantar flexion exercises, but when his foot was placed in the dorsiflexion position, he could maintain that position for 5 seconds. (R. 83). Mr. Wendt could also curl his toes. (R. 83). Dr. McKenna concluded from this report that there was "a slight dichotomy here between the functionality and the abilities." (R. 83). He inferred that the disconnection lead Dr. Arnett to check on the situation by performing an EMG which was normal besides prolongation of the H-reflexes and mild neuropathy. (R. 84). Dr. McKenna also cited as support for his conclusion Dr. Sweeney's discharge summary from Mr. Wendt's November 2009 hospital visit stating the doctors found no anatomical cause of the patient's deficits (in not being able to move the right leg) before discharging him. (R. 84).

Taken together, Mr. Wendt's November 2009 hospital visit along with the perceived weakness in his previous MRIs led Dr. McKenna to conclude that his pain may not have an objective basis. (R. 84). He stated:

> So, the question is really raised by this constellation of evidence here is that it appears that the neurologic findings appear to be more behavioral and appear to be more

12

psychogenic than objective and have an objective basis.  So, I think that is the problem with this particular claim

(R. 84).

Dr. McKenna further concluded about Mr. Wendt's pain:

So, we really don't have any decent clinical picture of the kind of either anatomic or physiologic or clinical that would support the kind of pain complaints that he's complaining of

(R. 89).

Based on these conclusions, Dr. McKenna imposed two functional limitations on Mr. Wendt.  First, Mr. Wendt's three back operations, including the insertion of the hardware, were mutilating procedures and would leave lasting effects.  (R. 89).  Second, Dr. McKenna concluded that the medical record showed that Mr. Wendt has two herniated discs which were significant limitations.  (R. 89-90).

In terms of restrictions on work activity, Dr. McKenna would limit Mr. Wendt's functional capacity to first only lifting light loads – 20 lbs occasionally and 10 lbs frequently. (R. 90).  Dr. McKenna disagreed with Dr. Keeney's recommendation that Mr. Wendt could only stand for 2 hours in an 8 hour day and concluded "my preference would be, if I want to go on the objective evidence, is say that [Mr. Wendt] could stand and walk for 6 out of 8 hours."  (R. 90). Mr. Wendt, in Dr. McKenna's opinion, could use foot controls, occasionally climb ramps, stairs, and 6 ft step ladders, and could not use long ladders, ropes, and scaffolds.  (R. 91).  He could also only occasionally stoop, crouch, kneel, or crawl and occasionally overhead reach.  (R. 93). Mr. Wendt would also have to avoid exposure to extreme cold, vibrating machines, and dangerous machines where he may have to take quick evasive action.  (R. 94).

Dr. McKenna was also dismissive of Mr. Wendt's Crohn's Disease and Mr. McMenamim's FCE.  In terms of Mr. Wendt's Crohn's Disease, Dr. McKenna notes "there's no history of imaging of his bowel showing it to light up with any nuclear imaging or showing thickening with any other CT imaging of his bowel or history of bowel dysfunction in the file." (R. 87).  Therefore, Mr. Wendt's Crohn's disease is not established in the file.  (R. 87).  Dr. McKenna also "never actually studied the derivation of [the FCE] in detail" and could not "make a judgmental assessment on [the FCE], whether it's valid or not."  (R. 98).

### 3. The Vocational Expert's Testimony

The Vocational Expert testified about a hypothetical person of the claimant's age, education, and work history with the limitations that Dr. McKenna listed in his testimony.  (R. 100-105).[1]  This hypothetical person would be able to work as a labeler, and there are 6,500 labeler positions in Illinois and 84,000 positions nationally.  (R. 104).  They would also be able to work as a small parts assembler, and there are 8,000 small parts assembler positions in Illinois and 97,000 positions nationally.  (R. 105).  Those numbers would be reduced to 3,500 positions in Illinois and 39,000 positions nationally with an occasional far reaching limitation.  (R. 105).  The hypothetical person could also perform work as an office helper with 2,100 position in the state and 55,000 positions nationally.  (R. 104).  Additionally, the Vocational Expert testified that if Dr. McKenna's limitations were modified to including standing for a total of 2 hours of an 8 hour work day instead of 6 hours, the hypothetical person would still be able to perform the jobs of labeler and small parts assembler.  (R. 105).

---

[1] Those limitations were light exertional level lighting(20 lbs occasionally, 10 lbs frequently), sit/stand for a total of 6 hours in an 8 hour workday, able to operate foot controls, push and pull, unable to climb ladders, ropes or scaffolds, able to occasionally climb ramps, stairs, and stepladders, able to occasionally stoop, crouch, kneel, or crawl, occasionally bilaterally reach far in front where the trunk is bent, no moderate exposure to extreme cold, vibrating machines, or dangerous machinery.

If the hypothetical person would have to take unscheduled breaks, the Vocational Expert testified that they would likely not be able to find work. For example, if the hypothetical person needed to stand for 5 to 10 minutes for every 15 to 20 minutes of sitting, and they would be off task while standing, then they would not be able to find work in the national economy. (R. 106). Also, if the individual needed one unscheduled break in addition to the regular morning, lunch, and afternoon breaks to lay down, they would not be able to find work in the national economy. (R. 108). If the hypothetical individual needed any additional break that would exceed 5 minutes, they would not find work in the national economy. (R. 109). The Vocational Expert testified that generally if the employee were off task for anything more than 15% of the day, they would not be able to find work in the national economy. (R. 107).

### D. The ALJ's Decision

The ALJ found that Mr. Wendt had the following severe impairments: status post back surgeries, herniated discs, scoliosis, and lumbago. In terms of Mr. Wendt's Crohn's disease and cardiomyopathy, the ALJ classified those impairments as non-severe. (R. 20). There was not enough medical evidence in the record to support Mr. Wendt's testimony regrading the severity of his Crohn's disease, and the record indicated that his cardiomyopathy was under control as of May 31, 2006. (R. 20). The ALJ also found that Mr. Wendt's severe impairments did not meet the criteria for any listing, particularly listing 1.04, because the medical evidence did not mention any findings equivalent in severity to the listing criteria. (R. 21).

Next, the ALJ assigned weight to different people from the medical record including the state agency medical consultants, Dr. Sweeney, Dr. Johnson, Dr. McKenna, and Mr. McMenamin. First, the ALJ gave the state agency medical consultants little weight. (R. 26).

The state agency medical consultant did not get a chance to examine Mr. Wendt or hear his testimony at the hearing like Dr. McKenna. (R. 26). Additionally, the state agency medical consultant relied on the opinion of consultative examiner Dr. Carlton. (R. 26). The ALJ dismissed Dr. Carlton's assertion that Mr. Wendt's standing tolerance may be limited because it appeared to be based on Mr. Wendt's subjective complaints which the ALJ thought were disproved by the MRIs and EMG tests. (R. 27).

The ALJ also dismissed Dr. Sweeney's and Dr. Johnson's opinion as worthy of little weight. Overall, the ALJ thought the doctors' opinions were inconsistent with their own treatment notes and the medical record as a whole. One reason the ALJ gave for dismissing Dr. Sweeney's and Dr. Johnson's opinion was it appeared that the doctors' opinions were based in part on Mr. Wendt's subjective reporting of pain, but the ALJ thought that the electro-diagnostic testing and multiple MRIs proved that it was physically impossible for Mr. Wendt to experience that level of pain. (R. 27).

However, the ALJ gave many reasons for dismissing the two doctors' opinions based on the doctors' lack of experience with the Social Security Disability program. First, he found fault with both Dr. Sweeney and Dr. Johnson for not indicating in their case notes whether their opinions were that Mr. Wendt could not perform his previous work or that he could not perform any work. (R. 27). The doctors did not perform a function-by-function analysis of Mr. Wendt's abilities either. (R. 27). Finally, the ALJ gave more weight to Dr. McKenna because he "provided a function by function assessment and detailed testimony in support of his conclusion." (R. 27). Dr. McKenna was also given additional weight because he had specialized knowledge of the Social Security Disability regulations. (R. 27).

Similarly, the ALJ mixed medical and non-medical reasons for giving Dr. McKenna's opinion substantial weight. Dr. McKenna testified that the EMG tests and MRI reports would not support the severity of Mr. Wendt's pain allegations, and the ALJ found those conclusions supported by his review of the medical evidence. (R. 28). The ALJ also appreciated the fact that Dr. McKenna's residual functional capacity assessment compensated for Mr. Wendt's pain claims and decreased range of motion by limiting him to light work and restricting his ability to climb ladders, ropes, or scaffolds or bend at the trunk, and that Dr. McKenna provided a function-by-function analysis of Mr. Wendt's abilities. (R. 28). Overall, the ALJ gave Dr. McKenna significant weight because he found Dr. McKenna's opinion consistent with the medical record. (R. 28).

The ALJ gave little weight to Mr. McMenamin's opinion because he felt that "Mr. McMenamin's test report indicates the claimant was unable to stand", while "Dr. Carlton's exam indicated [the claimant] was able to walk fifty feet unassisted and was able to rise from a sitting position without assistance." (R. 27). Even though Mr. McMenamin's report indicated that a "never" score on the standing test meant that Mr. Wendt could not stand for over 1/3 of an 8 hour work day, the ALJ interpreted the report as asserting that Mr. Wendt could physically never stand. (R. 27). The ALJ also dismissed Mr. McMenamin's report because it did not include any description of the tests used in the report and because overall the report was inconsistent with how the ALJ interpreted the medical record. (R. 27).

Finally, the ALJ found Mr. Wendt's statements about his limitations less than fully credible. The ALJ gave five reasons supporting this determination. First, he noted that Mr. Wendt's testimony about his pain and limitations were out of proportion relative to the ALJ's

interpretation of the medical record. (R. 28). Next, the ALJ found that Mr. Wendt's refusal to seek out low cost and free medical treatment hurt his credibility. (R. 28). The ALJ also noted that the record did not contain any information about treatment for Mr. Wendt's Crohn's disease even though in his testimony Mr. Wendt indicated significant bowel dysfunction. (R. 28). Another problem for the ALJ was that Mr. Wendt could not remember the year that he stopped taking Hydrocodone. (R. 28). Finally, the ALJ claimed that the medical record never indicated that Mr. Wendt showed signs of muscle atrophy or wasting even though Mr. Wendt claimed to lie in bed for most of the day. (R. 28).

Overall, the ALJ adopted Dr. McKenna's RFC for Mr. Wendt. He the found that Mr. Wendt could perform the positions of labler, office helper, and small part assembler according to the RFC and the Dictionary of Occupational Titles (DOT). (R. 29-30). Since it seemed that Mr. Wendt could adjust to work that existed in significant numbers in the national economy, the ALJ thought that a finding of "not disabled" was appropriate. (R. 30).

### III. Discussion

### A. The Standard of Review

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "more than a mere scintilla," and is such relevant evidence as a reasonable mind might accept to support a conclusion. *Berger v. Astrue,* 516 F.3d 539, 544 (7th Cir. 2008), *citing Richardson v. Perales,* 402 U.S. 389, 401 (1971).

We review the ALJ's decision directly, but we do so deferentially, *Weatherbee v. Astrue,* 649 F.3d 565, 568–69 (7th Cir. 2011), and we play an "extremely limited" role. *Simila v. Astrue,*

573 F.3d 503, 513–514 (7th Cir. 2009); *Elder v. Astrue,* 529 F.3d 408, 413 (7th Cir. 2008). The court may not reweigh the evidence, or substitute its judgment for that of the ALJ. *Terry v. Astrue,* 580 F.3d 471, 475 (7th Cir. 2009); *Berger,* 516 F.3d at 544. Where conflicting evidence would allow reasonable minds to differ as to whether the claimant is disabled, it is the ALJ's responsibility to resolve those conflicts. *Elder,* 529 F.3d at 413; *Binion v. Chater,* 108 F.3d 780, 782 (7th Cir. 1997). However, conclusions of law are not entitled to such deference and, if the ALJ commits an error of law, the decision must be reversed. *Schmidt v. Astrue,* 496 F.3d 833, 841 (7th Cir. 2007).

While the standard of review is deferential, the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002). In order for the court to affirm a denial of benefits, the ALJ must "minimally articulate" the reasons for her decision. *Berger,* 516 F.3d at 544; *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001). This means that the ALJ "must build an accurate and logical bridge from [the] evidence to [the] conclusion." *Dixon,* 270 F.3d at 1176; *Giles ex rel. Giles v. Astrue,* 483 F.3d 483, 486 (7th Cir. 2007). It's also called a "lax" standard. *Berger,* 516 F.3d at 544. Although the ALJ need not address every piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala,* 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the claimant a meaningful judicial review. *Hopgood ex rel. L.G. v. Astrue,* 578 F.3d 696, 698 (7th Cir. 2009). This means that the ALJ must rest a denial of benefits on adequate evidence contained in the record and must explain why contrary evidence does not persuade. *Eichstadt v. Astrue,* 534 F.3d 663, 665–66 (7th Cir. 2008).

## B. The Five-Step Sequential Analysis

The term "disability" is defined in § 423(d)(1) of the Act as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *Stanley v. Astrue,* 410 Fed.Appx. 974, 976 (7th Cir. 2011); *Liskowitz v. Astrue,* 559 F.3d 736, 739–40 (7th Cir. 2009).  The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

> 1) is the plaintiff currently unemployed;
> 2) does the plaintiff have a severe impairment;
> 3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;
> 4) is the plaintiff unable to perform his past relevant work; and,
> 5) is the plaintiff unable to perform any other work in the national economy?

20 C.F.R. § 404.1520; *Simila,* 573 F.3d at 512–13; *Briscoe ex rel. Taylor v. Barnhart,* 425 F.3d 345, 351–52 (7th Cir. 2005).

An affirmative answer leads either to the next Step or, on Steps 3 and 5, to a finding that the claimant is disabled.  20 C.F.R. § 416.920; *Briscoe,* 425 F.3d at 352; *Stein v. Sullivan,* 892 F.2d 43, 44 (7th Cir. 1990).  A negative answer at any point, other than Step 3, stops the inquiry and leads to a determination that the claimant is not disabled.  20 C.F.R. § 404.1520; *Stein,* 892 F.2d at 44.  The claimant bears the burden of proof through Step Four; if it is met, the burden shifts to the Commissioner at Step Five.  *Briscoe,* 425 F.3d at 352.

## C. Analysis

Mr. Wendt raises three issues for review.  He asserts:  (1) the ALJ's adverse credibility finding concerning Mr. Wendt's pain statements was erroneous; (2) the ALJ committed legal

error in according significant weight to Dr. McKenna's opinion; and, (3) the ALJ erred in his consideration of Mr. McMenamin's FCE report. (*Plaintiff's Motion for Summary Judgment,* 9-14).

## 1. The ALJ's Credibility Findings Regarding Mr. Wendt's Testimony are Patently Wrong

Mr. Wendt claims the reasons the ALJ provided supporting his adverse credibility finding were either wrong or inadequate to support the finding. (*Plaintiff's Motion for Summary Judgment,* 14-15). Thus, the ALJ's decision failed to consider the factors outlined in SSR 96-7p that would support a positive credibility finding and the factors mentioned by the ALJ are illogical. (*Plaintiff's Motion for Summary Judgment,* 15). The defendant's position is that the reasons the ALJ gave for finding Mr. Wendt less than fully credible are factors under SSR 96-7p and 20 C.F.R. § 404.1529, and that the ALJ took into account Mr. Wendt's pain complaints by limiting him to light work. (*Defendant's Response Brief,* 9-12).

An ALJ cannot disparage a claimant's credibility solely because of a lack of objective medical evidence supporting the claimant's pain complaints. *Hall v. Colvin*, 778 F.3d 688, 691 (7th Cir. 2015); *Pierce v. Colvin*, 739 F.3d 1046, 1049-1050 (7th Cir. 2014); *Bjornson v. Astrue*, 671 F.3d 640, 646 (7th Cir. 2012); *Myles v. Astrue*, 582 F.3d 672, 676-77 (7th Cir. 2009); *Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004); 20 C.F.R. § 404.1529(c)(2); SSR 96-7p(4). Pain can be disabling even though there is no objective evidence of pain in the claimant's record. *Pierce*, 739 F.3d at 1050; *Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006); *Sims v. Barnhart*, 442 F.3d 536, 537-538 (7th Cir. 2006); *Carradine*, 360 F.3d at 754. However, a discrepancy between the intensity of pain a claimant reports and the degree of pain suggested by

the objective medical evidence may indicate exaggeration. *Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005).

If there is a medically determinable explanation for the claimant's pain, the ALJ can only find the claimant's pain statements less than fully credible if the ALJ discusses the factors listed in 20 C.F.R. § 404.1529(c)(3). *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). The ALJ must provide more than a cursory discussion of the credibility factors. *Arnold v. Barnhart*, 473 F.3d 816, 822 (7th Cir. 2007); *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001); SSR 96-7p(7). Some examples of the factors listed in the regulations include: a claimant's daily activities; the location, duration, frequency, and intensity of the claimant's pain; precipitating and aggravating factors of the claimant's symptoms; treatments and medications used to relieve the symptoms; and, other measures used to relieve the symptoms. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009); *Flores v. Massanari*, 19 Fed.Appx. 393, 404 (7th Cir. 2001); 20 C.F.R. § 404.1529(c)(3)(i)-(vi).

Here, the ALJ's reasons besides the lack of objective medical evidence are inadequate. First, the ALJ cites Mr. Wendt's refusal to seek out free or low cost health care as evidence that he was exaggerating his pain complaints. The ALJ, however, had an obligation to examine any explanations the claimant gives to explain his failure to seek medical treatment. *Garcia v. Colvin*, 741 F.3d 758, 762 (7th Cir. 2013); *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012); SSR 96-7p. Mr. Wendt told the ALJ that it was difficult for him to travel to Stroger Hospital, and the county hospital closer to his home closed in 2010, but the ALJ failed to consider these reasons when finding Mr. Wendt less than fully credible. (R. 72-73).

Additionally, claimants without health insurance are likely to delay medical treatment, even for serious conditions, because they fear the financial consequence of treatment. *Garcia,* 741 F.3d at 762. Without his workers compensation insurance, which he lost in 2011, Mr. Wendt had no readily available means of accessing health care, and his failure to seek treatment cannot be held against him because of the financial realities of his situation unless the ALJ had a valid basis for rejecting the explanations. Also, given Mr. Wendt's stable work history as a delivery driver before his injury, it is not reasonable for the ALJ to have expected him to know the intricacies of the health care welfare system. For all these reasons, Mr. Wendt's failure to seek free health care does not support the ALJ's adverse credibility finding.

The ALJ also rested his adverse credibility termination on Mr. Wendt's inability to recall when he stopped taking Hydrocodone. But memories fade. The Seventh Circuit has warned ALJ's not to take claimant testimony so literally. *Mendez v. Barnhart*, 439 F.3d 360, 363 (7th Cir. 2006). This is especially true in this case because Mr. Wendt was taking many different pain medications, and it would not be surprising for him to confuse or forget the dates he stopped taking the medications. Dr. Johnson's report that mentions that Mr Wendt is not taking any pain medications also lists Cyclobenzaprine HCL (Flexeril) and Medrol (Pak), both pain medications, in the "Current Medications" section. (R. 666). In short, the supposed discrepancy between Mr. Wendt's testimony and the medical record is not a valid reason to discount Mr. Wendt's credibility.

Next, the ALJ complained that nowhere in the medical record did Mr. Wendt report the level of bowel dysfunction from Crohn's disease that he mentioned in his testimony and Activities of Daily Living report. Generally, a discrepancy between a claimant's reported

limitations and the medical evidence may be a sign that the claimant is not the best historian about his disabilities, *Pepper v. Colvin*, 712 F.3d 351, 369 (7th Cir. 2013), but the ALJ's particular reasoning here has many problems. Citing no cases, Mr. Wendt makes a good point that he had no reason to discuss his Crohn's disease with his neurosurgeons and physical therapists. (*Plaintiff's Motion for Summary Judgment,* 15). Actually, Mr. Wendt's point is analogous to the point the Court made in *Wilder v. Chater*, where Wilder claimed disability based on depression but the medical record only contained records from doctors with no mental health training except for one favorable report from a consultative psychiatrist. 64 F.3d 335, 337 (1995). There the Court stated "there is no reason to expect a doctor asked about an eye problem or a back pain, or an infection of the urinary tract to diagnose depression. He is not looking for it, and may not even be competent to diagnose it." *Id* (citations omitted). Dr. Sweeney and Dr. Johnson, whose notes make up the majority of the record, were specialists in back and neurosurgery. It was unreasonable for the ALJ to expect them to document Mr. Wendt's Crohn's disease and equally unreasonable for the ALJ to expect Mr. Wendt to discuss his Crohn's disease with these physicians.

Also, the medical evidence mentions medications that Mr. Wendt took to control his Crohn's disease. For example, one of Mr. Wendt's discharge reports from his November 2009 hospital stay mentions that he was prescribed Sulfasalazine 1000 mg for his Crohn's disease and that he left the hospital with a prescription for Colace, a treatment for Crohn's disease.[2] (R. 325).

---

[2] Everyday Health, What is Colace (Docusate Sodium)?, http://www.everydayhealth.com/drugs/colace, (last visited July 14, 2015).

In addition to the evidence of Mr. Wendt's Crohn's disease, the ALJ's reasoning is contrary to the point of 20 C.F.R. § 404.1529(c) and the case law interpreting the regulation. The regulations state "we [the Administration] will not reject your statements about the intensity and persistence of your pain or other symptoms... solely because the available objective medical evidence does not substantiate your statements," 20 C.F.R. § 404.1529(c)(2), and has been affirmed numerous times by the Seventh Circuit as a rule governing how the Agency must handle pain complaints or other limitations that do not have substantial medical evidence in the record. *See Hall*, 778 F.3d at 691; *Williams v. Colvin*, 757 F.3d 610, 615 (7th Cir. 2014)(specifically listing 20 C.F.R. § 404. 1529(c)(2) as "the Social Security Administration's own rule"); *Villano*, 556 F.3d at 562. In other words, the ALJ should not have discounted Mr. Wendt's statements about his Crohn's disease and other limitations because there was no medical evidence in the record to substantiate his Crohn's disease symptoms. Mr. Wendt was reasonable in listing all the limitations that could affect his ability to work in his DIB application, but the ALJ held it against Mr. Wendt that he discussed his Crohn's disease without submitting enough medical records documenting his Crohn's disease. This was contrary to the regulations and the Seventh Circuit's case law.

Finally, the ALJ concluded that "none of the examinations in the record indicate the claimant had any signs of muscle atrophy or wasting" even though "the claimant testified that he spent the majority of his day lying down." (R. 28). The ALJ's conclusion that this is proof that Mr. Wendt is lying about his pains and limitations is wrong for several reasons. First, Mr. Wendt testified that he got out of bed daily to shower, eat lunch, and help his nephew with homework. (R. 56-59). In his Activities of Daily Living report, Mr. Wendt also mentioned that

he tries to take a little walk during the day, lets his dog in and out of the house, and goes to the bathroom often. (R. 255). He is obviously somewhat mobile even if he just walks around his house and may be mobile enough to ward off atrophy and wasting. Second, the ALJ never mentions any medical opinion or academic evidence that would support his conclusion that someone with Mr. Wendt's mobility level would experience muscle atrophy or wasting. Third, a physical therapy report from late 2009 states that Mr. Wendt showed "muscle atrophy of the right quadriceps when compared to the left quadriceps" and "decreased right lower extremity strength." (R. 601). So, Mr. Wendt did experience some atrophy and decreased strength in the limbs affected by his pain and limitations.

An ALJ cannot base an adverse credibility finding on his misapprehension of the record or a basic factual inaccuracy. For example, in *Terry*, the Seventh Circuit remanded a case because the credibility determination was based on an inaccurate reading of the record. 580 F.3d at 477. There the ALJ ignored the claimant's long history of taking medication for depression and evidence suggesting a failed back surgery. *Id.* Also, in *Pierce*, the claimant suffered two back injuries: one in 2005 where her doctor advised her that she could lift only up to 40 pounds, and the other a year later resulting in the limitations that led to her disability claim. 739 F.3d at 1048. The ALJ used the doctor's statements from 2005 that the claimant could lift up to 40 pounds to find her not credible. The Court remanded the case in part because the credibility determination was based on this basic factual error. *Id*. at 1051.

Here, the ALJ both exaggerated Mr. Wendt's testimony and ignored medical evidence that was contrary to his conclusion that Mr. Wendt was lying about his pain. Mr. Wendt's medical records show that he is experiencing some weakness in the limbs affected by his

limitations and that there is evidence of atrophy. Furthermore, there is no medical evidence to warrant the conclusion that because Mr. Wendt reports that he spends a lot of time lying down that he should then experience muscle atrophy or wasting. This inaccurate reasoning cannot support the ALJ's adverse credibility finding concerning Mr. Wendt's testimony.

These four reasons have many logical and factual problems and cannot support an adverse credibility finding against Mr. Wendt. The only other reason the ALJ mentioned to support his adverse credibility finding was the discrepancy between the medical evidence and Mr. Wendt's testimony, which the case law makes clear is not in itself enough to discredit a claimant. See *Hall*, 778 F.3d at 691; *Pierce*, 739 F.3d at 1049-1050. Therefore, Mr. Wendt's case requires remand to the ALJ.

More than the reasons he does mention, the factors absent from the ALJ's credibility analysis supporting Mr. Wendt's claim show the need for remand in this case. Mr. Wendt's subjective pain complaints are almost entirely consistent throughout the record which includes five years of sometimes monthly appointments and treatments with different doctors and physical therapists. Indeed, one of the major points of the Seventh Circuit's credibility case law is that Social Security disability claimants will not undertake an extended course of painful and difficult medical treatment simply to qualify for public benefits. *Carradine*, 360 F.3d at 755. Mr. Wendt's medical record also indicates a conservative course of treatment, with the doctors pursuing physical therapy and pain medications before recommending surgery. Finally, before his injury, Mr. Wendt worked for the same company for 15 straight years delivering roofing and building supplies. His solid work history supports his credibility and is evidence that he would not lie about his pain. *Flores*, 19 Fed.Appx at 404; 20 C.F.R. § 404.1529(c)(3).

## 2. The ALJ Incorrectly Assigned Dr. Sweeney's and Dr. Johnson's Opinion "Little Weight"

Mr. Wendt also asserts that both Dr. McKenna and the ALJ essentially ignored the medical evidence that disproves their overall opinion that Mr. Wendt's pain was out of proportion to the imaging and tests in his records. Specially, Mr. Wendt points to the positive September 2007 discogram and Dr. Johnson's interpretation of Mr. Wendt's April 2010 MRI results as evidence of severe impairments. (*Plaintiff's Motion for Summary Judgment,* 10-11). Mr. Wendt also points out that, unlike Dr. McKenna, Dr. Johnson had access to the actual April 2010 MRI images, not merely the MRI report, and that it was reasonable for Dr. Johnson to have a contrary opinion from Dr. Patel, the radiologist, about the April 2010 MRI (*Plaintiff's Reply Brief,* 3-4).

A treating physician's opinion is entitled to controlling weight if it is well-supported and not inconsistent with the record evidence. *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011); *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010); 20 C.F.R. § 404.1527(c)(2). An ALJ generally can discount the opinion of a treating physician as long as there is good reason to do so. *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2010); *Clifford*, 227 F.3d at 870; 20 C.F.R. § 404.1527(c)(2). When the ALJ does not give the treating physician controlling weight, he should use the factors in 20 C.F.R. § 404.1527(c) as a guide in deciding how much weight to accord the opinion. *Campbell*, 627 F.3d at 308; *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006). The ALJ generally should give more weight to the treating physician because the treating physician often can provide the best longitudinal picture of the medical evidence. *Scrogham v. Colvin*, 765 F.3d 685, 696 (7th Cir. 2014); 20 C.F.R. § 404.1527(c). The factors

listed in the regulations include the length, nature, and extent of the treatment relationship; frequency of examination; the physician's specialty; the types of tests performed; the consistency and support for the physician's opinion; and, the physician's knowledge of the Social Security disability program and the claimant's case file. *Scrogham*, 765 F.3d at 697; 20 C.F.R. § 404.1527(c)(1)-(6).

Here, the ALJ gave Dr. Sweeney's and Dr. Johnson's opinion little weight because: (1) he thought the doctors' opinions were inconsistent with the EMG and MRI tests in the record; and, (2) Dr. Sweeney and Dr. Johnson failed to tailor their case notes to the particularities of the Social Security disability program. As an initial matter, the ALJ's decision deserves remand because he failed to discuss the factors in 20 C.F.R. § 404.1527(c) that support Dr. Sweeney's and Dr. Johnson's opinions. *Campbell*, 627 F.3d at 308 (citing *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010) and *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008)). Dr. Sweeney and Dr. Johnson were both neurosurgeons and had experience treating spine and back injuries. Mr. Wendt also saw Dr. Sweeney regularly for over a two year period often as much as once per month. Finally, while Mr. Wendt's back problems seemed like a difficult case, the medical record is consistent with a conservative course of treatment with all physical therapy and less invasive treatment options exhausted before surgery. There is also a well documented history of back problems and pain from the time of Mr. Wendt's work accident to the end of the medical records. These reasons, and others not mentioned, support according Dr. Sweeney and Dr. Johnson at least as much weight as the non-treating medical expert, Dr. McKenna.

Recent Seventh Circuit case law suggests that a negative EMG test result is not a good reason to discredit a treating physician's opinion. For example, *Hanson v. Colvin* involved a

claimant with similar lower back and leg pain. 760 F.3d 759, 759-760 (7th Cir. 2014). The ALJ rejected the treating physician's diagnosis of radiolopathy in part because the physician never ordered an EMG test, while the state medical consultant expressed doubt about the severity of the claimant's radiolopathy but agreed that the radiolopathy in fact existed. *Id.* at 760. The Court was not convinced that the lack of an EMG test was significant and remanded the case because of the agreement between the two physicians that the patient had some form of nerve damage. *Id.* at 761. Similarly, the Court found in *Engstrand v. Colvin* that there was no need for an EMG study to confirm a diabetic's neuropathy even though the ALJ thought the study was appropriate. 2015 WL 3505585, *3 (7th Cir. 2015). A claimant can legitimately suffer from pain or nerve damage without showing a positive EMG test for radiolopathy or neuropathy as the Seventh Circuit has recognized.[3] The ALJ should not have rushed to discredit Dr. Sweeney's and Dr. Johnson's opinion because the EMG test was negative.

On remand, the ALJ should weigh the medical opinions according to the factors outlined in 20 C.F.R. § 404.1527(c) without according undue weight to the factor crediting experience with the Social Security disability program, which is not a conclusive determinant or even one entitled to greater weight than the other factors in 20 C.F.R. § 404.1527(c).

---

[3]       *Hanson,* 760 F.3d at 760-761 ("A dermatome is an area of skin in which the sensory neurons all come from a single nerve. The administrative law judge may have thought that when DeWitt said 'sensation was intact to light touch in all dermatomes,' he was denying that the plaintiff had radiculopathy. But *pain, weakness, or decreased deep-tendon reflexes may be evidence of damage to the root of the nerve* and therefore support a diagnosis of radiculopathy.")(emphasis added); *Thomas v. Colvin*, 745 F.3d 802, 806 (7th Cir. 2014)("And sciatica is not always susceptible to more severe treatments; *in some cases, the cause cannot be identified. The Merck Manual of Medical Information* 571 (Mark H. Beers et al eds., 2d home ed.2003))(emphasis added); Karen Barr, MD, *Electrodiagnosis of Lumbar Radiculopathy*, Rehabilitation Medicine, University of Washington, (2013), https://depts.washington.edu/neurolog/images/emg-resources/Lumbar_Radiculopathy.pdf (accessed July 6th, 2015). ("[I]t is often noted that a patient may clinically seem to have a radiculopathy that electrodiagnostic testing is unable to diagnose.").

### 3.  The ALJ Assigned Mr. McMenamin's FCE Report "Little Weight"
### Without Adequate Discussion

Finally, Mr. Wendt claims that the ALJ "misapprehended" Mr. McMenamin's FCE report because the ALJ interpreted the "Never" score as meaning that Mr. Wendt could physically never stand.  (*Plaintiff's Motion for Summary Judgment,* 13-14).  He also claims that Mr. McMenamin was an "other medical source" under 20 C.F.R. § 404.1513(d)(1) and entitled to more consideration by the ALJ.  (*Plaintiff's Motion for Summary Judgment,* 13).  The Commissioner argues that Mr. McMenamin's report is an "other source" under 20 C.F.R. § 404.1513(d)(4) and SSR 06-3p, and as an "other source", the ALJ only had to explain the weight given to the source in a way that is sufficient to allow a reviewer to follow the ALJ's reasoning. (*Defendant's Response Brief,* 8).

The ALJ did in fact misunderstand the "Never" score in Mr. McMenamin's FCE.  His decision said "Mr. McMenamin concluded the claimant could not stand."  (R. 27).  In a footnote, the FCE explained that "a never score for standing does not mean that the client literally can never stand."  (R. 687).  The ALJ failed to consider this footnote.  The other reasons the ALJ gave for rejecting the FCE report -- that the FCE report did not list the tests Mr. Wendt overextended himself on and that the FCE report did not include a more thorough description of the tests used -- are somewhat illogical.  The report listed 26 tasks that Mr. McMenamin used to make his conclusions, and some of the tasks, like "climbing a ladder," are so obvious that no added explanation is needed.  (R. 686-687).   Also, the FCE report noted that Mr. Wendt overextended himself on some tasks to show that he made a good effort to perform his best on the tests.  Expanding on the tests that Mr. Wendt overextended himself does not add or subtract from the overall point that Mr. Wendt made a good effort to perform his best on the test.

An ALJ has an obligation to consider "other sources," particularly physical therapy reports, in making his RFC determination. *Voigt v. Colvin*, 781 F.3d 871, 878 (7th Cir. 2015); *Phillips v. Astrue*, 413 Fed.Appx 878, 884 (7th Cir. 2010); *Barrett v. Barnhart*, 355 F.3d 1065, 1067 (7th Cir. 2004); 20 C.F.R. § 404.1513(d). When considering "other sources," the ALJ should employ the factors in 20 C.F.R. § 404.1527(c) used to weigh the opinion of treating physicians. *Phillips,* 413 Fed.Appx at 884. The ALJ in this case did not adequately consider Mr. McMenamin's FCE report because he never mentioned any of the 20 C.F.R. § 404.1527(c) factors that support the FCE report.

On remand, the ALJ should analyze Mr. McMenamin's FCE report relative to the factors in 20 C.F.R. § 404.1527(c). The ALJ is not required to give Mr. McMenamin's FCE controlling weight, but the ALJ should base the weight he gives the report on the factors in 20 C.F.R. § 404.1527(c). *Phillips,* 413 Fed.Appx at 884.

## Conclusion

Mr. Wendt's Memorandum for remand [Dkt. #17] is GRANTED, and the Defendant's cross motion for summary judgment is DENIED. The case is remanded to the Social Security Administration for further proceedings consistent with this opinion.

**ENTERED:** _____

UNITED STATES MAGISTRATE JUDGE

**DATE:** 8/10/15